# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA and GEORGE PRICE, *on behalf of their daughter* O.P., *a minor, and individually on their own behalf,* ) ) ) ) | CIVIL ACTION NO. 3:11-cv-00095-JHS |
| *Plaintiffs*, ) ) | |
| v. ) | **FIRST AMENDED COMPLAINT** |
| ) | |
| SCRANTON SCHOOL DISTRICT, *et al.*, ) ) | **(Jury Trial Demanded)** |
| ) | |
| *Defendants*. ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs, O.P., a minor, by and through her parents, Barbara Price and George Price and Barbara Price and George Price individually (collectively "Plaintiffs"), by and through their counsel, FRANKEL & KERSHENBAUM, LLC, by way of their Complaint aver as follows:

### NATURE OF THE CASE

1.      O.P. was in her 5th period reading class on an October morning in 2009 when she heard the sound that would change her life forever.  Although O.P. could not know it at the time, that moment marked the beginning of a pattern of severe, pervasive and objectively offensive sexual harassment and other unlawful

bullying, creating a hostile environment that continues today, more than one year after it started, and that has caused O.P. to consider killing herself.  The bullies ganged up on her and taunted her about her private female medical condition, using it as a weapon to target her for ridicule, abuse, public humiliation and disgrace.  They further sexually harassed her by hurling epithets at her, including "bitch," "skank," "slut," "tramp," and "whore" and set out to poison her remaining friendships by defaming her and destroying her reputation for honesty and loyalty. The once popular "A" student, basketball player, yearbook editor and cheerleader is now traumatized, isolated, taking a prescription anti-depressant and under the care of a therapist and a physician treating her for Post Traumatic Stress Disorder, depression, anxiety and suicidal ideation.   Her former friends became her tormentors, and their parents, who were well aware of their children's abusive and unlawful behavior, failed to intervene and thereby became their accomplices. Teachers, staff and administrators in her school and the School District itself – all of whom had a duty to protect O.P. – chose to be passive observers, and worse, actual conspirators in the cruel, relentless and unlawful abuse.  O.P. comes before this Court to plead for help, to stop her tormentors and to demonstrate to other victims that our legal system will protect them by punishing the bullies and the School District that enables and empowers them **before** tragedy strikes.

**JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, specifically 20 U.S.C. § 1681, *et seq.* ("Title IX"), 42 U.S.C. § 1983 and the 14th Amendment to the United States Constitution.

3.     This Court has supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred within the jurisdiction of this Court.

**PARTIES**

**A.     Plaintiffs**

5.     Plaintiff O.P. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending South Scranton Intermediate School (the "School") in the Scranton School District.

6.      Plaintiffs Barbara Price ("O.P.'s Mother") and George Price ("O.P.'s Father") (collectively "O.P.'s Parents") are the natural parents and legal guardians of O.P. and at all relevant times have been residents of Scranton, Pennsylvania.

7.      O.P.'s Mother is a retired registered nurse.

8.      O.P.'s Father retired from the Scranton Police Department with the rank of Lieutenant; he is currently a Court Security Officer for the U.S. District Court for the Middle District of Pennsylvania and an instructor at Lackawanna College, where he teaches law enforcement.

**B.      School District Defendants**

9.      Defendant Scranton School District (the "District") is a governmental entity that provides public education to students in the Scranton area and is a recipient of federal funds.

10.      Defendant Robert Lesh ("Lesh") is named as a defendant both in his individual and official capacities.  At all relevant times, he acted under color of state law as the President of the Scranton School District Board of Directors.

11.      Defendant Robert Sheridan ("Sheridan") is named as a defendant both in his individual and official capacities.  At all relevant times, he acted under color of state law as a member of the Scranton School District Board of Directors.

4

12.     Defendant William King ("Superintendent King") is named as a defendant both in his individual and official capacities. At all relevant times, he acted under color of state law as the Superintendent of Schools in the District.

13.     Defendant Barbara Dixon ("Principal Dixon") is named as a defendant both in her individual and official capacities.  At all relevant times, she acted under color of state law as the Principal of the School.

14.     Defendant Kevin Rogan ("Vice Principal Rogan") is named as a defendant in his individual capacity.  At all relevant times, he acted under color of state law as the Interim Vice Principal of the School.

15.     Defendant Melissa Rose ("Vice Principal Rose") is named as a defendant in her individual capacity.  At all relevant times, she acted under color of state law as the Vice Principal of the School.

16.     Defendant Julie Maloney ("Mrs. Maloney") is named as a defendant in her individual capacity.  At all relevant times she acted under color of state law as a teacher at the School.  (As stated below, Mrs. Maloney is also named as a defendant for the purposes of Counts VII and VIII in her capacity as the mother of Defendant T.M.)

17.     Defendant Karyn Schaeffer ("Schaeffer") is named as a defendant in her individual capacity.  At all relevant times she acted under color of state law as a guidance counselor at the School.

18.     Defendant Amy Lloyd ("Lloyd") is named as a defendant in her individual capacity.  At all relevant times she acted under color of state law as a librarian at the School.

19.     Defendant Maria Rossi ("Rossi") is named as a defendant in her individual capacity.  At all relevant times she acted under color of state law as a teacher at the School.

20.     Defendant Lynne Michael ("Michael") is named as a defendant in her individual capacity.  All relevant times she acted under color of state law as a teacher at the School.

21.     Throughout this Amended Complaint, the Defendants named in paragraphs 9-20 shall be collectively identified as the "School District Defendants."

22.     Wherever the term "School District Defendants" is used in this Amended Complaint, it refers to *each and every one* of the School District Defendants.

## C.    The Student Defendants

23.    Defendant K.K. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

24.    Defendant A.R. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

25.    Defendant B.C. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

26.    Defendant J.P. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

27.    Defendant T.M. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

28.     Defendant M.E. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

29.     Defendant A.H. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

30.     Defendant I.D. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

31.     Defendant E.W. is a minor child who has resided at all relevant times in Scranton, Pennsylvania and who at all relevant times has been a student attending the School.

32.     Throughout this Amended Complaint, the Defendants named in paragraphs 23-31 shall be collectively identified as the "Student Defendants."

33.     Wherever the term "Student Defendants" is used in this Amended Complaint, it refers to *each and every one* of the Student Defendants.

**D.     The Parent Defendants**

34.     Defendants Paul Kelly and Colleen Kelly (collectively "K.K.'s Parents") are the parents of Defendant K.K. and at all relevant times have been residents of Scranton, Pennsylvania.

35.     Defendants Anthony Rasalla and Tina Rasalla (collectively "A.R.'s Parents") are the parents of Defendant A.R. and at all relevant times have been residents of Scranton, Pennsylvania.

36.     Defendants Gene Creegan and Yvette Creegan (collectively "B.C.'s Parents") are the parents of Defendant B.C. and at all relevant times have been residents of Scranton, Pennsylvania.

37.     Defendants Peter Petrucci and Cindy Petrucci (collectively "J.P.'s Parents") are the parents of Defendant J.P. and at all relevant times have been residents of Scranton, Pennsylvania.

38.     Defendants James Maloney ("Mr. Maloney") and Mrs. Maloney (collectively "T.M.'s Parents") are the parents of Defendant T.M. and at all relevant times have been residents of Scranton, Pennsylvania.  (As stated above, Mrs. Maloney is also a teacher at the School and is also named as a School District Defendant.)

39.     Defendants Ronald Evans and Lisa Ogonoski (collectively "M.E.'s Parents") are the parents of Defendant M.E. and at all relevant times have been residents of Scranton, Pennsylvania.

40.     Defendants Wayne Hiller and Nancy Hiller (collectively "A.H.'s Parents") are the parents of Defendant A.H. and at all relevant times have been residents of Scranton, Pennsylvania.

41.     Defendants Jose Duverge and Carmen Duverge (collectively "I.D.'s Parents") are the parents of Defendant I.D. and at all relevant times have been residents of Scranton, Pennsylvania.

42.     Defendants Robert Walsh and Kathryn Walsh (collectively "E.W.'s Parents") are the parents of Defendant E.W. and at all relevant times have been residents of Scranton, Pennsylvania.

43.     Throughout this Amended Complaint, the Defendants named in paragraphs 34-42 shall be collectively identified as the "Parent Defendants."

44.     Wherever the term "Parent Defendants" is used in this Amended Complaint, it refers to *each and every one* of the Parent Defendants.

## FACTS

45.     In October 2009, O.P. was a seventh grade student at the School.

46.    In or around October 2009, O.P. developed a painful and private female condition, specifically, a yeast infection.

47.    O.P.'s condition caused her significant discomfort which she tried to address by adjusting her clothing and discreetly scratching her genital area.

48.    Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. observed O.P.'s behavior caused by the yeast infection and seized upon it.

49.    Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. began making a noise (the "Scratching Sound") mimicking the sound made by O.P.'s scratching.

50.    The Scratching Sound sounded like "ch-ch."

51.    At all relevant times the Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. used the Scratching Sound, and/or the term "Zhu Zhu" as a variant of the Scratching Sound (collectively the "Sounds"),  as weapons to unlawfully taunt and sexually harass O.P.

52.    Defendant K.K. first made the Scratching Sound in October 2009 in O.P.'s seventh grade reading class.

53.    When they heard the Scratching Sound in class that day, Defendants A.R. and B.C. both burst out in laughter because they knew what it meant and knew that it was intended to humiliate and otherwise harm O.P.

54.    Defendants A.R. and B.C. were the only students in the class who laughed when Defendant K.K. made the Scratching Sound.

55.    Beginning in October 2009, Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. made the Sounds to O.P., both individually and in combination, and, as described in detail below, otherwise unlawfully bullied and sexually harassed O.P. both in and out of school.

56.    Beginning in October 2009, Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. taunted O.P. with the Sounds every day at school, multiple times a day, a pattern O.P. describes as "a way of life" for her.

57.    On or about October 23, 2009, after the School's Halloween Dance, O.P. went to a pizza parlor with Defendant I.D., Defendant E.W., and O.P.'s classmate N.K.

58.    In the presence of Defendant E.W. and N.K., Defendant I.D. publicly discussed what the Scratching Sound meant.

59.    Defendant I.D. stated that the Scratching Sound was about O.P.'s "female problem," specifically, her yeast infection.

60.    According to Defendant I.D., Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. widely publicized O.P.'s "female problem" by telling "everybody"

that the Scratching Sound was an imitation of the sound O.P. made when she scratched her genital area because of her yeast infection, that "everybody" knew it, and that Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. intentionally used and publicized the Scratching Sound specifically to humiliate and otherwise harm O.P.

61.    O.P. was outraged, hurt and embarrassed upon being told that Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. had intentionally and maliciously publicized her private female condition to "everybody."

62.    In addition, as a direct result of the sexual harassment, O.P. suffered more emotional and physical discomfort because she could no longer discreetly and privately address her private female condition because Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. had publicized it.

63.    To protect herself against the taunting and harassment, O.P. became more guarded, literally "keeping her head down" and leaving class to take refuge in the girls' restroom to avoid being tormented by Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E., thereby undermining and detracting from O.P.'s educational experience by effectively denying her equal access to the School's resources and opportunities.

64.     Multiple teachers including, but not limited to, Ms. Bridget Orlando, Ms. Courtney Homick and Mr. Seamus McCormick heard Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. making the Sounds on multiple occasions but took no appropriate action to intervene.

65.     The Student Defendants, individually and/or in combination, singled O.P. out for frequent verbal abuse.

66.     Additionally, the Student Defendants, individually and/or in combination, recruited other students to join them in ganging up on O.P.

67.     The Student Defendants, individually and/or in combination, encouraged O.P.'s classmates, including, but not limited to, T.O., M.C. and K.Z., to further bully and sexually harass O.P. by making the Scratching Sound.

68.     On at least 50 occasions, the Student Defendants, individually, and/or in combination, called O.P. a "bitch," a "skank," a "slut," a "tramp," or a "whore" all for the purpose of sexually harassing and otherwise harming O.P.

69.     Upon information and belief, none of the Student Defendants ever directed any of these sexual epithets at a boy.

70.     The sexual harassment and bullying were so severe, pervasive and objectively offensive that O.P. complained of a stiff neck because she was afraid to

turn her head to the left or right during school for fear of making eye contact with the Student Defendants, undermining and detracting from O.P.'s educational experience by effectively denying her equal access to the School's resources and opportunities.

71.    From October 2009 until April 2010, O.P. suffered in silence, in the vain hope that the sexual harassment and other bullying would stop and because of her fear that reporting it would only reveal to Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. how deeply their abuse hurt her and would encourage them to continue and increase their attacks as, in fact, they later did.

72.    During this period, no teachers, administrators or staff members took adequate steps to stop the unlawful bullying and sexual harassment, even though Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. were openly taunting O.P. with the Sounds in school.

73.    In or about March 2010, O.P. approached Defendant M.E. to demand that she and Defendants K.K., T.M., J.P., A.R., B.C. and A.H. stop the sexual harassment and other bullying.

74.    The very next day, Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. continued making the Sounds, calling O.P. a "bitch," a "skank," a "slut," a "tramp," or a "whore" and/or otherwise sexually harassing and bullying her.

**O.P. and O.P.'s Parents Reported the Bullying and Harassment to School Administrators.**

75.    On the evening of April 7, 2010, O.P. finally broke down and told her parents about the ordeal she had been enduring since October 2009, a period of more than six months.

76.    During this conversation, O.P. told her parents, "I just don't want to exist any more."

77.    As soon as school opened on the morning of April 8, 2010, O.P.'s Parents called the School to report the bullying and unlawful sexual harassment and to request a meeting to immediately address the attacks on O.P.

78.    Principal Dixon chose not to meet with O.P.'s Parents that day.

79.    On April 9, 2010, Principal Dixon and Vice Principal Rogan met with O.P. and O.P.'s Parents.

80.    At the meeting, O.P. detailed for Principal Dixon and Vice Principal Rogan all of the sexual harassment and other bullying including, but not limited to, the sexual nature of the Sounds and the frequent use of the words "bitch," "skank," "slut," "tramp," and "whore" by Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E.

81.    Principal Dixon responded by scolding O.P. for not reporting the sexual harassment sooner, which only added to O.P.'s misery, further undermining and detracting from O.P.'s educational experience by effectively denying her equal access to the School's resources and opportunities.

**The Relationships Among the School District Defendants and the Other Defendants Caused Them to Choose to Side With the Other Defendants and Against O.P.**

82.    The School District Defendants have allowed their personal and professional interests to interfere with their handling of the bullying and harassment.

83.    As a result of this personal and professional bias, the School District Defendants have chosen to protect their own interests and the interests of the other Defendants at O.P.'s expense.

84.    Defendant T.M. is the daughter of Mrs. Maloney.  Mrs. Maloney is the daughter of Thomas Smith ("Mrs. Maloney's Father"), who, in turn, had recently retired from his long-time position in the District as a teacher and athletic director at West Scranton High School.

85.    Principal Dixon also worked at West Scranton High School and is a personal friend of Mrs. Maloney's Father, as is Principal Dixon's husband.

86.     Mrs. Maloney's husband, Mr. Maloney, works for the District at Scranton High School and is also on the coaching staff there.

87.     Mrs. Maloney has stated that she and Superintendent King are the "best of friends."

88.     Mrs. Maloney has stated, "I run this school."

89.     Mrs. Maloney has also stated that Defendants "Rossi, Michael and Lloyd run [the school] with me."

90.     Defendant Lloyd is the daughter of the former Superintendent of Schools in Scranton.

91.     Defendant Kathryn Walsh works at the School.

92.     Defendant A.R.'s grandmother works at the School

93.     Defendant Cindy Petrucci works at Scranton High School.

**The School District Defendants Took Affirmative Steps to Protect Themselves and the Other Defendants Rather than O.P.**

94.     On Monday, April 12, 2010, Principal Dixon called the following student witnesses into her office: V.W., K.C., R.A., S.D., N.K., G.M., A.J.A., A.A., M.C., T.O. and Defendants I.D. and E.W.

95.    That same day Principal Dixon also called Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. into her office.

96.    Defendant Dixon later told O.P.'s Parents that **all** of the student witnesses confirmed the bullying and harassment and that Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. **all** admitted to bullying and harassing O.P., confirming O.P.'s version of their unlawful behavior.

97.    As explained above, Defendant T.M., one of the ringleaders of the Student Defendants, is the daughter of Mrs. Maloney, a teacher at the School and Mr. Maloney, an employee and member of the coaching staff at Scranton High School.

98.    Before T.M. went to the principal's office, Defendants Lloyd, Rossi and Michael called T.M. into the School library.

99.    Once they gathered in the library, Defendants Lloyd, Rossi, Michael and T.M. used the internal School phone to call Mrs. Maloney in her classroom.

100.   Together, Defendants Lloyd, Rossi, Michael, T.M. and Mrs. Maloney unlawfully conspired to harm O.P. by supporting T.M.'s unlawful behavior, helping her avoid punishment for it and enabling and empowering her to continue

her bullying and harassment of O.P. by crafting T.M.'s responses to any questions asked by Principal Dixon.

101.   During this meeting, Defendants Lloyd, Rossi and Michael assured T.M. that she had, "nothing to worry about."

102.   This meeting and conversation were malicious, deliberate and unlawful acts designed to harm O.P. by interfering with and undermining the investigation and were seen and overheard by another student.

103.   That same day, O.P.'s classmate, A.A., used her cell phone to show Vice Principal Rogan Defendant B.C.'s Facebook page containing a number of pictures of O.P. with disparaging comments about her.

104.   Later that afternoon, in yet another unlawful act of bullying, Defendant B.C. confronted O.P. in the girls' bathroom at School, expressing her anger about being called into the principal's office, causing O.P. to feel threatened for reporting the bullying and harassment.

105.   On April 23, 2010, O.P.'s Mother spoke with Principal Dixon on the telephone to express her concern that the bullying and harassment were continuing and that the District was not taking steps to stop it and to protect O.P.

106.   During this call, Principal Dixon suggested that Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E., all of whom sat at the same table in the cafeteria, would no longer be permitted to do so.

107.   Rather than taking even this minimal action immediately, Principal Dixon yet again sent a message that she would tolerate the behavior of Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. by delaying for six days before changing the seating in the cafeteria, and then allowing Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. to choose their new seats and still allowing some of these Defendants to sit together.

108.   In fact, some or all of the Student Defendants have been sitting together in the cafeteria in various combinations since the beginning of the 2010-2011 school year, emboldening and enabling them to continue and escalate their harassment of O.P.

109.   Also during the telephone conversation on April 23, 2010, Principal Dixon proposed that O.P. be subjected to an inappropriate series of face-to-face meetings with her tormentors.

110.   O.P.'s Mother explained to Principal Dixon that O.P. was far too traumatized to be subjected to such meetings.

111.   O.P.'s Mother suggested that it would be safer for O.P. emotionally for Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. to submit written apologies.

112.   Principal Dixon promised that she would require Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. to write and deliver letters of apology.

113.   O.P. never received a single letter of apology.

114.   Later on April 23, 2010, the same day that O.P.'s Mother spoke with Principal Dixon, O.P.'s Father went to the School to meet with Vice Principal Rogan regarding his concern that Principal Dixon was siding with Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. against O.P.

115.   O.P.'s Father explained to Vice Principal Rogan that no one from the District was taking effective steps to stop the unlawful harassment and were instead emboldening and enabling Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E.

116.   In fact, the bullying and harassment were continuing and getting worse.

117.   Because the bullying and harassment were continuing, O.P.'s Parents concluded that Principal Dixon was unwilling to take effective steps to stop it or to

protect O.P and that Principal Dixon had in fact chosen to side with the other Defendants and against O.P.

118.   On April 29, 2010, O.P.'s Parents met with Superintendent King in his office to express their concern for the health and safety of their daughter and their concern about Principal Dixon's bias.

119.   They talked at length about the details and effects of the bullying including, *inter alia*, the sexual nature of the harassment, including, but not limited to, the use of the Scratching Sound, the use of the sexually charged words "bitch," "skank," "slut," "tramp," and "whore," O.P.'s social isolation, O.P.'s depression, anxiety and her suicidal ideation.

120.   In addition, O.P.'s Parents expressed their concern that Principal Dixon was intentionally applying the School's anti-bullying policy arbitrarily and capriciously because of the personal relationships between and among Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E., their parents, Principal Dixon and other School District employees, including, but not limited to, the fact that Defendant T.M.'s mother, Mrs. Maloney, is a teacher at the School and T.M.'s father, Mr. Maloney, is employed by the District at Scranton High School and is a member of the coaching staff there.

121.   Superintendent King initially seemed to express some understanding and support; however, his tone and response changed as soon as O.P.'s Parents described the unlawful and conspiratorial meeting in the School library on April 12, 2010.

122.   O.P.'s Parents later discovered that, despite his promise to fully investigate their concerns and personally take control of the crisis, Superintendent King instead took an affirmative step to minimize the crisis and decrease the likelihood of stopping the bullying and harassment when he subsequently told Principal Dixon that she should handle the matter "at the building level."

123.   On May 7, 2010, O.P. was called from class to the office of her Guidance Counselor, Defendant Schaeffer.

124.   Schaeffer told O.P. that Principal Dixon had instructed Schaeffer to talk with O.P.

125.   O.P. told Schaeffer that Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. were still bullying and harassing her.

126.   Outrageously, without having O.P.'s Parents present and without consulting them prior to this meeting, Defendant Schaeffer stated to O.P., who was

then only 13 years old, that she needed psychological help and immediately sent O.P. back to her class.

127.   Immediately after this conversation, O.P. reported what happened in the meeting to her mother who immediately called Schaeffer to express her outrage.

128.   Defendant Schaeffer admitted to O.P.'s mother that Principal Dixon had specifically instructed her to call O.P. out of class, ask her how she was, suggest she needed psychological help and send her back to class, all without the knowledge, consent or participation of O.P.'s Parents.

129.   Neither Principal Dixon, Defendant Schaeffer nor anyone else from the District ever contacted O.P.'s Parents before, during or after this meeting to explain why they told O.P. she needed psychological help or why they felt it was appropriate, rather than outrageous, to do that to a 13 year old child without ever consulting or notifying her Parents.

130.   The specific and affirmative acts of the School District Defendants, during both the 2009-2010 and 2010-2011 school years, further harmed O.P. and sent a clear message to the Student Defendants that they would not face any serious punishment for their outrageous and unlawful behavior.

131.   After bullying O.P. for six months, creating a hostile sexual environment through their severe, pervasive and persistent sexual harassment of O.P. and, on more than one occasion, driving O.P. to consider taking her own life, Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. were given brief detentions and told not to sit together at lunchtime.

**The Parent Defendants Knew That Their Children Were Bullying and Sexually Harassing O.P. and Failed to Intervene**

132.   On or about April 12, 2010, the District gave K.K.'s Parents, A.R.'s Parents, B.C.'s Parents, J.P.'s Parents, T.M.'s Parents, M.E.'s Parents and A.H.'s Parents actual notice of their children's unlawful behavior.

133.   According to the District, "Parent conferences were held with all students who received punishment" for the bullying and sexual harassment.

134.   At 5:17 p.m. on April 12, 2010, just hours after being called into Principal Dixon's office, undeterred and emboldened by her meeting with Principal Dixon, Defendant A.R. retaliated against O.P. for reporting the unlawful sexual harassment and other bullying in an instant message in which A.R. threatened that she would "beat up" O.P. and that A.R.'s mother, Defendant Tina Rasalla, would "kick your mother's ass."

**Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. Continued to Bully and Sexually Harass O.P. Over the Summer and Defendants I.D. and E.W. Joined the Bullying and Harassment During the 2010-11 School Year.**

135.   During the summer of 2010, Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. continued their attacks on O.P.

136.   Specifically intending to further harm O.P., Defendants K.K., T.M., J.P., A.R., B.C., A.H. and M.E. extended the scope and breadth of their unlawful sexual harassment and other bullying by publicizing the Scratching Sound and its relation to O.P.'s private female condition to an entirely new group of students, this time at neighboring Marian Catholic School in Scranton.

137.   J.M., a friend of Defendant J.P., made the Scratching Sound to O.P., stating, "It's a South [Scranton Intermediate School] thing.  You know what it is."

138.   The Student Defendants changed their tactics as they continued and intensified their unlawful attacks at the beginning of the 2010-2011 school year.

139.   Upon information and belief, Defendant I.D.'s Parents and Defendant E.W.'s Parents knew or should have known about their daughters' unlawfully bullying and sexual harassment of O.P.

140.   No longer content to abuse and torment O.P. themselves, the Student Defendants began a deliberate, calculated and concerted effort to further isolate

O.P. by defaming her and thereby poisoning her relationships with her remaining friends.

141.   From September 2010 until at least December, 2010, specifically intending to further harm and socially isolate O.P., the Student Defendants spread gossip, lies and false rumors about O.P. and falsely accused her of making disparaging remarks about other classmates.

142.   One classmate, T.O., stated that the Student Defendants actively publicized false and malicious gossip about O.P. and that their vicious attacks on O.P. were relentless, occurring "every day, day and night."

143.   The Student Defendants continued their unlawful sexual harassment of O.P. by falsely accusing O.P. of directing the sexual epithets "bitch," "skank," "slut," "tramp," and "whore" at other female classmates; O.P. never made any such statements.

144.   In or around September 2010, Defendant I.D. accused O.P. of "talking about her family" in a derogatory way, but did not disclose the specific content of the statements O.P. was alleged to have made or who told her about them; O.P. never made any such statements.

145.  On October 5, 2010, Defendant E.W. sent O.P. a text message accusing O.P. of saying "terrible things" about her, terminating her friendship with O.P. and threatening O.P., warning her not to report the text.

146.  Defendant E.W. would not tell O.P. who told her about the statements O.P. was alleged to have made; O.P. never made any such statements.

147.  The Student Defendants achieved their goal of subjecting O.P. to even greater social isolation.

148.  O.P. and classmate R.A. have been friends since they were toddlers.

149.  During the school day on October 15, 2010, O.P. and R.A. interacted normally.

150.  At 3:12 p.m. on that same day, just minutes after boarding the school bus with Defendant K.K. and Defendant A.H., O.P.'s classmate R.A. sent O.P. a message on Facebook stating, "Im sorry but i no longer want to be your friend. You talk about everyone behind their backs.  Im really sorry but i just can't trust you anymore.  Dont talk to me or try to make things right because nothing you can say will help."

151. On October 18, 2010, yet another of O.P's classmates,  A.A., confronted O.P. and accused her of making sexually charged comments about her,

including that A.A. "wears too much makeup" and wears "revealing bikinis"; O.P. never made any such statements.

152.   Immediately after this confrontation, O.P. sought out School Resource Officer Joseph Kearney, who is also her basketball coach, and begged him for help.

153.   Officer Kearney, who is also a Scranton Police officer, ignored O.P.'s pleas, told her he could not "talk about this now" and never followed up on O.P.'s plea for help.

154.   O.P.'s classmate A.A. has since severed her friendship with O.P.

155.   On October 19, 2010, O.P.'s classmate R.A. sent O.P. another Facebook message stating, "I just think youre not a good person to be friends with."

156.   In or around April 2010, Regina Moore, mother of O.P.'s friend and classmate J.W., told O.P.'s Parents that Defendant T.M. told J.W. that O.P. is not allowed to be friends with J.W. because J.W. is African American.

157.   O.P.'s Mother assured Ms. Moore that O.P. never made the statement T.M. attributed to her, that O.P. and O.P.'s Parents are neither bigots nor racists and that O.P. and her family deeply value O.P.'s friendship with J.W.

158.   Between September and November 2010, several more of O.P.'s classmates at the School, including, *inter alia¸* T.O. and A.J.A., severed their friendships with O.P. based on disparaging statements about them falsely attributed to O.P. by the Student Defendants.

159.   Specifically, Defendant E.W. falsely told O.P.'s classmate F.C. that O.P. was saying disparaging things about him; O.P. never made any such statements.

160.   Defendant T.M. falsely told O.P.'s classmate K.C. that O.P. called K.C. a "bitch;" O.P. never made any such statements

161.   On October 19, 2010, Defendant T.M. falsely told O.P.'s classmate M.K. that O.P. called M.K. a "bitch;" O.P. never made any such statements.

**The School District Defendants Continued to Demonstrate Bias Against O.P. by Choosing to Protect the Other Defendants Rather Than O.P.**

162.   On or around October 15, 2010, O.P.'s Parents once again reported to Principal Dixon that the unlawful bullying and sexual harassment were continuing unabated and were, in fact, causing O.P. even greater harm.

163.   As she did the first time O.P. reported the bullying and harassment to her, Principal Dixon again scolded O.P. for not reporting it sooner, once again adding to O.P.'s misery, further undermining and detracting from O.P.'s

educational experience by effectively denying her equal access to the School's resources and opportunities.

164.   In October 2010, O.P.'s Parents met with and spoke with Principal Dixon and Vice Principal Rose on multiple occasions and provided them with specific examples of the ongoing bullying.

165.   Principal Dixon promised to conduct an investigation and to punish the Student Defendants if she felt they were still bullying and harassing O.P.

166.   O.P.'s Parents asked Principal Dixon to take immediate steps to stop the bullying and harassment pending the outcome of the investigation.

167.   Principal Dixon refused to take any immediate action to stop the bullying and harassment.

168.   Upon information and belief, Principal Dixon instead deliberately conducted an ineffective investigation and refused O.P.'s Parents' repeated requests for the redacted reports Principal Dixon claimed she had prepared as part of her investigation.

169.   In October 2010, more than **one year** after it started and at least **six months** after the School District Defendants, K.K.'s Parents, A.R.'s Parents, B.C.'s Parents, J.P.'s Parents, T.M.'s Parents, M.E.'s Parents and A.H.'s Parents

had actual notice of the unlawful bullying and harassment, the cruel, relentless and outrageous attacks continued as did O.P.'s suffering.

**After Six Months of Trying to Work Cooperatively with the District, O.P.'s Parents Reluctantly Sought Legal Advice**

170.   Only after the School Defendants chose to protect the Student Defendants rather than protect O.P., thereby failing repeatedly to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring, did O.P.'s Parents retain counsel to help them protect their daughter.

171.   Counsel for O.P.'s Parents first contacted the District's Solicitor, Harry P. McGrath ("McGrath"), on October 18, 2010 to notify him that O.P.'s Parents had retained counsel to help O.P. and to seek McGrath's help in addressing the bullying and sexual harassment.

172.   On October 19, 2010, Principal Dixon met with O.P.'s Parents but refused to respond to their requests for information about the ongoing bullying and harassment or to their requests that the District take immediate and effective steps to stop the unlawful attacks on O.P.

173.   Later that same day, **just one day** after O.P.'s counsel first contacted McGrath to seek his help in finding a cooperative solution to the crisis, the District, through Principal Dixon, cut off all direct communication with O.P.'s Parents in a letter notifying them that, "[a]ny further correspondence will go through [counsel]."

174.   In or around October 2010, the District, through its counsel McGrath, without any factual basis, blamed the victim for the unlawful sexual harassment and other bullying, stating, "[O.P.] knows how to stir the pot."

175.   On November 9, 2010, more than three weeks after O.P.'s Parents provided Principal Dixon with specific evidence of ongoing bullying and harassment, McGrath sent a letter to O.P.'s Parents' counsel requesting that O.P.'s Parents provide evidence of the bullying and harassment, all of which O.P.'s Parents had already given to Principal Dixon.

176.   In or around October 2010, the District proposed mediation to O.P.'s Parents.

177.   Despite their concern about the process and the possibility that the Student Defendants would use the mediation to further bully and harass O.P., O.P.'s Parents agreed to participate in mediation.

178.   The District sabotaged O.P. and O.P.'s Parents yet again when it eventually selected a mediator who was unqualified to facilitate a resolution to a bullying and sexual harassment crisis.

179.   The District further undermined the process by refusing to be a party to the mediation, a fact confirmed by the mediator and the District.

180.   Furthermore, the District has repeatedly, consistently and falsely insisted that O.P.'s Parents refused to participate in the mediation and conveyed this false information to the District's Board of School Directors.

181.   Although the District was aware that as many as twelve students were involved in the harassment, the District provided the Mediator with the names of only two, Defendants T.M. and A.R.

182.   On or about October 26, 2010, Mediator Anthony Libassi (the "Mediator") notified O.P.'s Parents that the District had retained him to mediate this matter.

183.   The Mediator told O.P.'s Parents that the District chose him "by default" because "there was no one else who could handle it."

184.   The Mediator's website and online biography describe his specialty as "Divorce and Custody" matters.

185.   The Mediator's website does not mention sexual harassment.

186.   The Mediator's website does not mention bullying.

187.   In fact, in a meeting with O.P.'s Parents on November 1, 2010, the Mediator told O.P.'s Parents that he had never mediated a bullying dispute.

188.   In this meeting, the Mediator told O.P.'s Parents that "the abuse will not stop even if mediation led to an agreement" among the parties and that O.P. would "have to learn to deal with it."

189.   Nevertheless, desperate for anything that might help O.P., O.P.'s Parents spent another two weeks attempting to engage in the District's proposed mediation process while O.P. continued to suffer.

190.   On November 15, 2010, the Mediator notified O.P.'s Parents that the mediation would not take place.

191.   To date, no one from the District has communicated with O.P.'s Parents or their counsel to discuss the fact that the mediation never took place and that the process failed.

192.   To date, no one from the District has communicated with O.P.'s Parents or their counsel to offer any alternative to the failed mediation.

193.   The District is wrong when it insists that it adequately responded to the bullying and harassment.

194.   At approximately 11:00 a.m. on Thursday, December 16, 2010, O.P. was in the hallway of the School going from one class to another when an unidentified student made the Scratching Sound twice.

**The District and Defendants Lesh, Sheridan, King and Dixon Ignored and Rejected Multiple Attempts by O.P.'s Parents to Amicably Resolve This Matter Without Litigation**

195.   As described more fully throughout this Amended Complaint, O.P.'s Parents have been attempting to engage the District, both directly and through counsel, to resolve this matter.

196.   These attempts continued until just days before filing the original Complaint.

197.   On December 13, 2010, O.P.'s Father met with Defendant Sheridan in Sheridan's capacity as a member of the Scranton School Board.

198.   O.P.'s Father told Sheridan that the School District Defendants had failed to stop the bullying and harassment and had not adequately addressed their effects on O.P.

199.   Sheridan told O.P.'s Father that McGrath, counsel for the District, had stated to him that "the issue was being handled."

200.   O.P.'s Father corrected this mischaracterization of the situation, prompting Sheridan to call Defendant Lesh, the President of the Scranton School Board.

201.   Sheridan gave his phone to O.P.'s Father so that he could speak to Defendant Lesh directly.

202.   During this conversation, O.P.'s Father expressed his deep concern directly to Defendant Lesh.

203.   Defendant Lesh responded, "Well, you refused mediation."

204.   As described above, it was the District, not Plaintiffs, that refused to participate in the mediation, which O.P.'s Father explained to Defendant Lesh.

205.   Defendant Lesh then asked how the mediation went and O.P.'s father explained that the Mediator had never called the parties together and had cancelled the mediation before it started.

206.   After this conversation, neither Defendant Sheridan nor Defendant Lesh ever followed up with O.P.'s Father.

207.   Upon information and belief, the entire School Board had actual notice of the unlawfully bullying and sexual harassment.

208.   In addition to direct communications between O.P.'s Parents and the School District Defendants, counsel for O.P. and O.P.'s Parents have communicated with the District through its counsel on multiple occasions, by telephone, email and letters.

209.   These communications began on October 18, 2010.

210.   On December 20, 2010, after two months of unsuccessful attempts to engage the District in a meaningful conversation, counsel for O.P. and O.P.'s Parents sent McGrath a letter containing a settlement proposal and stressing again that the family would file suit only as a last resort.

211.   As a further demonstration of the family's desire to fully inform the District of their intentions before filing the original Complaint, counsel for O.P. and O.P.'s parents provided McGrath with a redacted caption of the Complaint along with its first paragraph on December 20, 2010.

212.   In addition, on December 20, 2010, O.P.'s Father personally met with Defendant Sheridan to provide him with a copy of the letter, the settlement

proposal and the caption and first paragraph of this Amended Complaint to share with the School Board at its meeting that night.

213.   That night, after the School Board meeting, O.P.'s Father asked Defendant Sheridan what the School Board planned to do.

214.   Defendant Sheridan refused to discuss it with O.P.'s Father at that time, but promised to call O.P.'s Father the next day.

215.   Despite his promise, Defendant Sheridan failed to call O.P.'s Father the next day; thus, O.P.'s Father called him.

216.   During this conversation Sheridan assured O.P.'s Father that the School Board had instructed McGrath to contact counsel for O.P. and O.P.'s Parents to discuss the proposal.

217.   Upon information and belief, Defendants Sheridan and/or Lesh, either individually or via School Board counselor McGrath, informed the entire Scranton School Board of O.P.'s Parents' allegations of sexual harassment of O.P. and the District's failure to respond appropriately, including, but not limited to, the taunting of O.P. with the Sounds, the harassment of O.P. with the sexual epithets "bitch," "skank," "slut," "tramp," and "whore," the attacks on O.P.'s character, including her reputation for honesty and loyalty, O.P.'s social isolation, O.P.'s

depression, anxiety and her suicidal ideation and the continued existence of a sexually hostile environment at the School.

218.   As of the date of this Amended Complaint, neither McGrath nor anyone else from the District has contacted the family or its counsel as Defendant Sheridan promised.

219.   Consequently, the District has failed to meet its legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

220.   In spite of the Student Defendants' actions, the sexual nature of the harassment, including, but not limited to, the taunting of O.P. with the Sounds, the harassment of O.P. with the sexual epithets "bitch," "skank," "slut," "tramp," and "whore," the attacks on O.P.'s character, including her reputation for honesty and loyalty, O.P.'s social isolation, O.P.'s depression, anxiety and her suicidal ideation and in spite of the continued existence of a sexually hostile environment at the School, the District insists that it has "found no substantiation" that O.P. is still being victimized by the Student Defendants.

**O.P. and O.P.'s Parents All Suffered Severe and Permanent Damage.**

221.   In spite of being abused by the Student Defendants and neglected by the Parent Defendants, and in spite of the District's role in actively encouraging and empowering the Student Defendants and failing to stop the bullying and harassment for more than one year, O.P. has never retaliated.

222.   Despite her remarkable restraint and despite her ability to appear stoic to the outside world, O.P. is a 14 year-old girl who has, like many young victims of relentless bullying and harassment, contemplated suicide to stop her suffering.

223.   As a direct result of the sexual harassment and other bullying by the Student Defendants, the failure of the Parent Defendants to intervene, the School District Defendants' complicity and failure to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring:

   a. O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

   b. O.P. has, on multiple occasions, considered committing suicide;

c.  O.P. suffers from nightmares and awakens screaming in the middle of the night;

d.  O.P.'s grades decreased during the 2009-2010 school year;

e.  O.P. has become withdrawn and socially isolated;

f.  O.P. has suffered a loss of appetite;

g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

h.  O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a local private school.

224.  As a direct result of the sexual harassment and other bullying by the Student Defendants, the failure of the Parent Defendants to intervene and the failure of the District and the School District Defendants to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring, O.P.'s

Parents suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof, including, *inter alia,* depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

## COUNT I
## 20 U.S.C. § 1681, *et seq.* (Title IX)
## Hostile Environment – Sexual Harassment and Discrimination
### *O.P.  v. Scranton School District*

225.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

226.   At all relevant times, the specific acts of bullying and harassment, including, *inter alia*, the Student Defendants' use of the Scratching Sound and the epithets "bitch," "skank," "slut," "tramp," and "whore" were based on O.P.'s sex.

227.   As described more fully throughout this Amended Complaint, and at all relevant times, this sex-based bullying and harassment created a hostile environment for O.P. because it was sufficiently severe, pervasive and objectively offensive so as to interfere with or limit O.P.'s ability to participate in or benefit from the services, activities, or opportunities offered by the District.

228.   As described more fully throughout this Amended Complaint, at all relevant times the District, including but not limited to Defendants Lesh, Sheridan,

King and Dixon, knew or should have known about the hostile environment that existed for O.P. at the School.

229.   As described more fully throughout this Amended Complaint, at all relevant times the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, failed to investigate and respond immediately and appropriately in a prompt, thorough and impartial manner and failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

230.   As described more fully throughout this Amended Complaint, the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, instead affirmatively encouraged, supported and/or condoned the unlawful harassment by, *inter alia*:

      a.   Intentionally choosing to protect the Student Defendants at O.P.'s expense by minimizing and ignoring the sexual harassment and other bullying and otherwise failing to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring;

b.  Intentionally refraining from taking appropriate disciplinary action against the School District Defendants who conspired to harm O.P. by obstructing the School's investigation and coaching one of the Student Defendants how to evade discipline;

c.  Intentionally choosing to allow the bullying and harassment to continue unabated without adequately training the School's staff how to identify and address bullying and harassment in the School;

d.  Intentionally choosing to blame the victim, *e.g.*, by accusing O.P. of "stir[ring] the pot";

e.  Intentionally choosing to impose only the most minimal and ineffective remedial measures to address the bullying and harassment, rather than to escalate the punishments and other remedies as required by the District's own policy and by law when the lesser measures had clearly failed;

f.  Intentionally delaying and frustrating the remediation by initiating an ineffective mediation process with an unqualified and incompetent Mediator.

g. Intentionally delaying and frustrating the remediation by ignoring O.P.'s parents repeated efforts to resolve this problem without litigation.

231.  At all relevant times, and as described more fully throughout this Amended Complaint, the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, had actual knowledge of the of the discrimination alleged herein.

232.  At all relevant times, and as described more fully throughout this Amended Complaint, Defendants Lesh, Sheridan, King and Dixon were officials of the Scranton School District with authority to take corrective actions to end the discrimination alleged herein.

233.  At all relevant times, and as described more fully throughout this Amended Complaint, the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, intentionally and deliberately failed to take corrective actions to end the discrimination alleged herein.

234.  As a direct result of the failure of the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring:

a. O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

b. O.P. has, on multiple occasions, considered committing suicide;

c. O.P. suffers from nightmares and awakens screaming in the middle of the night;

d. O.P.'s grades decreased during the 2009-2010 school year;

e. O.P. has become withdrawn and socially isolated;

f. O.P. has suffered a loss of appetite;

g. O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

h. O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

**WHEREFORE**, O.P. respectfully requests Judgment in her favor and against the Defendants named in this Count providing O.P. with compensatory damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

**COUNT II**
**42 U.S.C. § 1983**
**U.S. Constitution – Fourteenth Amendment – Substantive Due Process**
*Plaintiffs v. Scranton School District, Defendant Lesh in his official and individual capacities, Defendant Sheridan in his official and individual capacities, Superintendent King in his official and individual capacities, Principal Dixon in her official and individual capacities, Vice Principal Rogan in his individual capacity, Vice Principal Rose in her individual capacity, and Defendants Mrs. Maloney, Rossi, Lloyd, Michael and Schaeffer in their individual capacities*

235.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

236.   At all relevant times, and as described more fully throughout this Amended Complaint, each Defendant named in this Count acted under color of state law.

237.   As described more fully throughout this Amended Complaint, each Defendant named in this Count knowingly and intentionally deprived O.P and O.P.'s Parents of well-established federal rights.

238.   As described more fully throughout this Amended Complaint, as a direct result of these deprivations by each of the Defendants named in this Count:

    a.   O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

    b.   O.P. has, on multiple occasions, considered committing suicide;

    c.   O.P. suffers from nightmares and awakens screaming in the middle of the night;

    d.   O.P.'s grades decreased during the 2009-2010 school year;

    e.   O.P. has become withdrawn and socially isolated;

    f.   O.P. has suffered a loss of appetite;

    g.   O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

h. O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

239.   As a direct result of the failure of each Defendant named in this Count to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring, O.P.'s Parents suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof, including, *inter alia,* depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

240.   As described more fully throughout this Amended Complaint, policy makers for the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, established and maintained policies, customs and practices of the District that affirmatively contributed to O.P. being deprived of her clearly established, constitutionally protected liberty interest in bodily integrity, specifically, the right to be free from the abuse and injuries described herein.

241. Among the policies, customs and practices that affirmatively contributed to these deprivations were:

a. The policy makers' intentional decisions to protect the Student Defendants at O.P.'s expense by minimizing and ignoring the sexual harassment and other bullying and failing to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring;

b. The policy makers' intentional decisions to refuse to take appropriate disciplinary action against the School District Defendants who conspired to harm O.P. by obstructing the School's investigation and coaching one of the Student Defendants how to evade discipline;

c. The policy makers' intentional decisions to allow the bullying and harassment to continue unabated without adequately training the School's staff how to identify and address bullying and harassment in the School;

d. The policy makers' intentional decisions to blame the victim, *e.g.*, by accusing O.P. of "stir[ring] the pot" and scolding O.P. for not coming forward sooner;

e.   The policy makers' intentional decisions to impose only the most minimal and ineffective remedial measures to address the bullying and harassment, rather than to escalate the punishments and other remedies as required by the District's own policy and by law when the lesser measures had clearly failed;

f.   The policy makers' intentional decision to delay and frustrate the remediation by initiating an ineffective mediation process with an unqualified and incompetent Mediator.

242.   As described more fully throughout this Amended Complaint, policy makers for the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, had actual knowledge of the prior and ongoing deprivations to O.P.'s clearly established constitutional and federal statutory rights.

243.   As described more fully throughout this Amended Complaint, policy makers for the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, acted with deliberate indifference in response to their actual knowledge of the prior and ongoing deprivations to O.P.'s well-established constitutional and federal statutory rights.

244.   As described more fully throughout this Amended Complaint, the actions of policy makers for the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, violated federal law by, *inter alia*:

    a.   Failing to eradicate the hostile environment in which O.P. was tormented based on her private, female condition and attacked with sexual epithets such as "bitch," "skank," "slut," "tramp," and "whore";

    b.   Failing to adopt and implement an effective anti-harassment and anti-bullying policy in the School;

    c.   Failing to appropriately discipline the School District Defendants who actively conspired to interfere with the School's investigation into the bullying and harassment; and

    d.   Blaming O.P. for the abuse by the Student Defendants.

245.   As described more fully throughout this Amended Complaint, policy makers for the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, failed to train District personnel adequately in the areas of sexual harassment and bullying response and prevention, despite an obvious and known need for such training.

246.   As described more fully throughout this Amended Complaint, there is a plausible nexus between this failure to provide adequate training and O.P.'s constitutional and statutory deprivations described herein.

247.   As described more fully throughout this Amended Complaint, the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, failed to adequately train its employees to handle recurring situations such as the escalating victimization of O.P., which created the obvious potential for violation of O.P.'s right to bodily integrity, and in fact did lead to such violations.

248.   As described more fully throughout this Amended Complaint, each defendant named in this Count individually participated in or approved of the violations of O.P.'s well-established federal statutory and constitutional rights.

249.   As described more fully throughout this Amended Complaint, Defendants with supervisory capacity within the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, had knowledge of and affirmatively encouraged, supported and/or condoned violations of O.P.'s well-established constitutional and federal statutory rights by their subordinates.

250.   As described more fully throughout this Amended Complaint, Defendants with supervisory capacity within the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, had contemporary knowledge of

the prior and ongoing violations of O.P.'s well-established constitutional and federal statutory rights by their subordinates and responded with affirmative acts condoning, encouraging or tolerating these violations.

251.   As described more fully throughout this Amended Complaint, these unlawful responses were motivated, in significant part, by these Defendants' close personal and professional relationships among the families of some or all of the Student Defendants and the other School District Defendants.

252.   The interest of parents in the care, custody, and control of their children is among the oldest of the fundamental liberty interests recognized by the United States Supreme Court.

253.   As described more fully throughout this Amended Complaint, the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, failed to train its employees adequately to effectively address recurring situations such as the escalating victimization of O.P., which created the obvious potential for violations of O.P.'s Parents' fundamental rights related to the care, custody, and control of O.P.

254.   As described more fully throughout this Amended Complaint, as a direct result of the failure of the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, to take prompt and effective steps reasonably

calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring:

    a.  O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

    b.  O.P. has, on multiple occasions, considered committing suicide;

    c.  O.P. suffers from nightmares and awakens screaming in the middle of the night;

    d.  O.P.'s grades decreased during the 2009-2010 school year;

    e.  O.P. has become withdrawn and socially isolated;

    f.  O.P. has suffered a loss of appetite;

    g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

h. O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

255.   As a direct result of the failure of the District, including but not limited to Defendants Lesh, Sheridan, King and Dixon, to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring, O.P.'s Parents suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof, including, *inter alia,* depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

256.   As described more fully throughout this Amended Complaint, at all relevant times the acts and omissions of each Defendant named in this Count were outrageous and due to evil motive or reckless indifference for O.P.'s and her Parents' rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

**WHEREFORE**, Plaintiffs respectfully request Judgment in their favor and against the Defendants named in this Count providing Plaintiffs with

compensatory damages, punitive damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *O.P. v. Student Defendants and Defendants Dixon and Schaeffer*

257.  Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

258.  As described more fully throughout this Amended Complaint, the Student Defendants intentionally tormented, humiliated, harassed and abused O.P., including, *inter alia*, by relentlessly taunting her about her private female condition, repeatedly deriding her with sexual epithets, such as "bitch," "skank," "slut," "tramp," and "whore," systematically isolating and alienating her from her friends by spreading false and malicious rumors about her and/or pressuring others not to associate with her.

259.  As described more fully throughout this Amended Complaint, Defendants Dixon and Schaeffer intentionally and outrageously subjected O.P. to an inappropriate, private meeting with Defendant Schaeffer, without O.P.'s Parents' presence or knowledge, in order to shift the blame to O.P. and to evade their legal obligation to take prompt and effective steps reasonably calculated to

end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

260.   As described more fully throughout this Amended Complaint, at all relevant times Defendants' conduct was extreme and outrageous, going beyond all bounds of decency.

261.   As described more fully throughout this Amended Complaint, at all relevant times Defendants' conduct was motivated by callous indifference to Plaintiffs' rights.

262.   As a direct result of Defendants' outrageous behavior:

a.   O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

b.   O.P. has, on multiple occasions, considered committing suicide;

c.   O.P. suffers from nightmares and awakens screaming in the middle of the night;

d.   O.P.'s grades decreased during the 2009-2010 school year;

e.   O.P. has become withdrawn and socially isolated;

f.  O.P. has suffered a loss of appetite;

g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

h.  O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

263.   The Defendants named in this Count are all legally liable, jointly and severally for the severe harm averred in this Count.

**WHEREFORE**, O.P. respectfully requests Judgment in her favor and against the Defendants named in this Count providing her with compensatory damages, punitive damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

## COUNT IV
## INVASION OF PRIVACY
### False Light and Publication of Private Fact
### *O.P.  v. Student Defendants*

264.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

## A. False Light

265.   As described more fully throughout this Amended Complaint, the Student Defendants made multiple false statements pertaining to O.P. and O.P.'s Parents, including, *inter alia*:

   a.   Characterizing O.P. as disloyal by falsely attributing to O.P. disparaging statements about O.P.'s friends and classmates;

   b.   Attacking and damaging O.P.'s reputation for honesty by telling friends and classmates that she was a liar;

   c.   Defendant T.M. falsely accusing O.P. and O.P.'s Parents of bigotry and racism racists by telling O.P.'s friend and classmate J.W. that O.P. is not allowed to be friends with J.W. because J.W. is African American.

266.   As described more fully throughout this Amended Complaint, the Student Defendants published these comments to the public, including, *inter alia*: O.P.'s classmates K.Z., M.C., F.C., K.C., T.O., A.A., J.W., R.A., A.J.A., V.W., G.M., M.K., S.D., and Regina Moore, as well as to a large number of other students both at the School and at other schools in the area, including, *inter alia,* Marian Catholic School in Scranton.

267.   As described more fully throughout this Amended Complaint, Defendants publicized matters concerning O.P. that created highly offensive, false impressions about O.P. to others.  These matters included, *inter alia*:

    a.   Falsely attributing to O.P. disparaging statements about O.P.'s classmates;

    b.   Attacking and damaging O.P.'s reputation for honesty and loyalty;

    c.   Falsely accusing O.P. and O.P.'s Parents of bigotry and racism.

268.   As described more fully throughout this Amended Complaint, the Student Defendants' publication of these matters was of a type that would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

269. As described more fully throughout this Amended Complaint, Defendants' publication of these matters did in fact cause O.P. mental suffering, shame, and/or humiliation.

## B. Publication of Private Facts

270. As described more fully throughout this Amended Complaint and as can be reasonably inferred from the facts herein, the Student Defendants publicized O.P.'s private female condition by, *inter alia*: publicizing these private facts to "everybody" and publicizing these private facts to students in at least one other school in the area.

271. As described more fully throughout this Amended Complaint, the matters pertaining to O.P.'s female medical condition were private facts, the publication of which would be highly offensive to a reasonable person and which are of no legitimate concern to the public.

272. As described more fully throughout this Amended Complaint, Defendants' publication of this condition was in fact highly offensive to O.P.

273. As described more fully throughout this Amended Complaint, as a direct and proximate result of this invasion of privacy, O.P. suffered and continues to suffer severe injuries, including, *inter alia*:

a.  O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

b.  O.P. has, on multiple occasions, considered committing suicide;

c.  O.P. suffers from nightmares and awakens screaming in the middle of the night;

d.  O.P.'s grades decreased during the 2009-2010 school year;

e.  O.P. has become withdrawn and socially isolated;

f.  O.P. has suffered a loss of appetite;

g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

h.  O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

274.   As described more fully throughout this Amended Complaint, at all relevant times, Defendants' conduct was outrageous and due to evil motive or reckless indifference for O.P.'s rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

275.   The Defendants named in this Count are all legally liable, jointly and severally for the severe harm averred in this Count.

**WHEREFORE**, O.P. respectfully requests Judgment in her favor and against the Defendants named in this Count providing O.P. with compensatory damages, punitive damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

## COUNT V
## CIVIL CONSPIRACY
*O.P. v. The Student Defendants, Defendants Mrs. Maloney, Lloyd, Rossi, Michael, Dixon and Schaeffer*

276.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

277.   As described more fully throughout this Amended Complaint, Mrs. Maloney and Defendants Lloyd, Rossi and Michael (collectively, the "Library Defendants") acted with a common unlawful purpose of harming O.P. by

frustrating and otherwise unlawfully interfering with the School District's investigation into the bullying and harassment of O.P. and to further T.M.'s unlawful harassment of O.P.

278.   As described more fully throughout this Amended Complaint, the Library Defendants committed acts in furtherance of their unlawful scheme to harm O.P., including, *inter alia,* meeting in the School Library and to support T.M.'s unlawful behavior, to help her avoid punishment for it in order to enable and empower her to continue her bullying and harassment of O.P. by crafting T.M.'s responses to any questions asked by Principal Dixon.

279.   As described more fully throughout this Amended Complaint, this meeting and conversation were malicious, deliberate and unlawful acts designed to harm O.P. by unlawfully interfering with and undermining the investigation thereby enabling Defendant T.M. to continue bullying, harassing and otherwise intentionally inflicting emotional distress upon O.P.

280.   As more fully described throughout this Amended Complaint, the Library Defendants' conduct was outrageous and due to evil motive or reckless indifference for O.P.'s rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

281. As described more fully throughout this Amended Complaint, the Student Defendants acted in various combinations with a common purpose of unlawfully bullying, harassing and otherwise intentionally inflicting severe emotional distress on O.P.

282. As described more fully throughout this Amended Complaint, and as can be reasonably inferred therefrom, the Student Defendants conspired in various combinations including, but not limited to, in class, in the cafeteria, on the school bus, during extra-curricular activities, and communicated in person, by cell phone, in text messages, emails and online.

283. As described more fully throughout this Amended Complaint, the Student Defendants committed several acts in furtherance of their unlawful scheme, including, *inter alia,* meeting and communicating, in person, by phone, through text messages and/or other online communications, on multiple occasions to create, implement and perpetuate a scheme designed to unlawfully bully, harass, torment, humiliate, embarrass and socially isolate O.P.

284. As described more fully throughout this Amended Complaint, Principal Dixon and Defendant Schaeffer acted with a common purpose to cause O.P. emotional distress, to violate O.P.'s right to bodily integrity under the Fourteenth Amendment to the United States Constitution by outrageously telling

O.P., without O.P.'s Parents' presence or knowledge, that she needed psychological help.

285.   As described more fully throughout this Amended Complaint, Principal Dixon and Defendant Schaeffer took acts in furtherance of this unlawful plan, including removing 13 year old O.P. from class, calling her to Defendant Schaeffer's office, telling her she needed psychological help and withholding this information from O.P.'s Parents.

286.   As described more fully throughout this Amended Complaint, this conspiracy is further evidence of the District's unlawful efforts to blame the victim and evade its legal obligations to take prompt and effective steps reasonably calculated to end the harassment, eliminate and hostile environment and its effects, and prevent the harassment from recurring.

287.   As described more fully throughout this Amended Complaint, as a direct and proximate result of this civil conspiracy, O.P. suffered and continues to suffer severe injuries, including, *inter alia*:

a. O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

b.  O.P. has, on multiple occasions, considered committing suicide;

c.  O.P. suffers from nightmares and awakens screaming in the middle of the night;

d.  O.P.'s grades decreased during the 2009-2010 school year;

e.  O.P. has become withdrawn and socially isolated;

f.  O.P. has suffered a loss of appetite;

g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff creating a hostile environment for O.P.;

h.  O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

288.  As more fully described throughout this Amended Complaint, the purpose of the conspiracies alleged herein was to harm O.P.

289.   As more fully described throughout this Amended Complaint, the conduct of the Defendants named in this Count was outrageous and due to evil motive or reckless indifference for O.P.'s rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

290.   The Defendants named in this Count are all legally liable, jointly and severally for the severe harm averred in this Count.

**WHEREFORE**, O.P. respectfully requests Judgment in their favor and against the Defendants named in this Count providing her with compensatory damages, punitive damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

## COUNT VI
## CIVIL CONSPIRACY
### *Plaintiffs  v.  School District Defendants*

291.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

292.   As described more fully throughout this Amended Complaint, and as can be reasonably inferred therefrom, the School District Defendants acted with a common, malicious, deliberate and unlawful purpose of denying and otherwise interfering with Plaintiffs' Constitutional and other federal rights.

293.   As described more fully throughout this Amended Complaint, and as can be reasonably inferred therefrom, the School District Defendants committed acts in furtherance of their unlawful scheme, in various combinations, to harm Plaintiffs including, *inter alia,* meeting, conferring and otherwise communicating in person, by telephone and via electronic means, for the unlawful purpose of evading their legal obligations to take prompt and effective steps reasonably calculated to end the harassment, eliminate and hostile environment and its effects, and prevent the harassment from recurring, and to otherwise protect Plaintiffs' Constitutional rights.

294.   As described more fully throughout this Amended Complaint, as a direct and proximate result of this civil conspiracy, O.P. suffered and continues to suffer severe injuries, including, *inter alia*:

     a.   O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

     b.   O.P. has, on multiple occasions, considered committing suicide;

     c.   O.P. suffers from nightmares and awakens screaming in the middle of the night;

d.  O.P.'s grades decreased during the 2009-2010 school year;

e.  O.P. has become withdrawn and socially isolated;

f.  O.P. has suffered a loss of appetite;

g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff creating a hostile environment for O.P.;

h.  O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

295.  As described more fully throughout this Amended Complaint, as a direct and proximate result of this civil conspiracy, O.P.'s Parents suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof, including, *inter alia,* depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

296.   As more fully described throughout this Amended Complaint, the School District Defendants' conduct was outrageous and due to evil motive or reckless indifference for Plaintiffs' rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

297.   The Defendants named in this Count are all legally liable, jointly and severally for the severe harm averred in this Count.

**WHEREFORE**, Plaintiffs respectfully request Judgment in their favor and against the Defendants named in this Count providing Plaintiffs with compensatory damages, punitive damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

## COUNT VII
## NEGLIGENCE
### *O.P. v. Parent Defendants*

298.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

299.   As described more fully throughout this Amended Complaint, at all relevant times Parent Defendants had a duty to exercise reasonable care to control their minor children so as to prevent them from intentionally harming others or from so conducting themselves as to create an unreasonable risk of harm to others.

300.   As described more fully throughout this Amended Complaint, at all relevant times Parent Defendants knew or had reason to know that they had the ability to control their children; and knew or should have known of the necessity and opportunity for exercising this control in order to prevent their children from harming O.P. and O.P.'s Parents.

301.   As described more fully throughout this Amended Complaint, at all relevant times Parent Defendants negligently breached their duty by failing to control their children despite having the ability and opportunity to do so.

302.   As described more fully throughout this Amended Complaint, as a direct and proximate result of Parent Defendants' negligent failure to control their children despite having the ability and opportunity to do so, O.P. suffered and continues to suffer severe injuries, including, *inter alia*:

   a. O.P. suffers from PTSD, depression and anxiety, is taking a prescription anti-depressant and being treated by a therapist and a physician;

   b. O.P. has, on multiple occasions, considered committing suicide;

   c. O.P. suffers from nightmares and awakens screaming in the middle of the night;

    d.  O.P.'s grades decreased during the 2009-2010 school year;

    e.  O.P. has become withdrawn and socially isolated;

    f.  O.P. has suffered a loss of appetite;

    g.  O.P. has been unable to explore or participate in any additional extracurricular activities and has withdrawn from her position on the school yearbook because some of the Student Defendants are on the yearbook staff, creating a hostile environment for O.P.;

    h.  O.P. will be withdrawing from the District at the end of this school year and O.P.'s Parents will be forced to pay tuition at a private school.

303.  As described more fully throughout this Amended Complaint, as a direct and proximate result of Parent Defendants' negligent failure to control their children despite having the ability and opportunity to do so, O.P.'s Parents suffered and continues to suffer severe injuries, including, *inter alia,* severe emotional distress accompanied by physical manifestations thereof, including, *inter alia,* depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

304.   As more fully described throughout this Amended Complaint, the School District Defendants' conduct was outrageous and due to evil motive or reckless indifference for Plaintiffs' rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

305.   The Defendants named in this Count are all legally liable, jointly and severally for the severe harm averred in this Count.

**WHEREFORE**, Plaintiffs respectfully request Judgment in their favor and against the Defendants named in this Count providing Plaintiffs with compensatory damages, punitive damages, costs and attorneys' fees, and any and all other relief deemed just and equitable by this Court.

## COUNT VIII
## PARENTAL STRICT LIABILITY (23 Pa. Code § 5501, *et seq*.)
### *Plaintiffs v. Parent Defendants*

306.   Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Amended Complaint as if set forth in full herein.

307.   Each of the Parent Defendants is a "parent" for the purposes of 23 Pa. Code § 5501, *et seq*.

308.   23 Pa. Code § 5502 provides that, "Any parent whose child is found liable or is adjudged guilty by a court of competent jurisdiction of a tortious act

shall be liable to the person who suffers the injury to the extent set forth in this chapter."

**WHEREFORE**, Plaintiffs respectfully request Judgment in their favor and against the Parent Defendants per 23 Pa. Code § 5501, *et seq.*

Respectfully submitted

**FRANKEL & KERSHENBAUM, LLC**

By:

Dated: March 18, 2011

/s/Dave Frankel
Dave Frankel, Esq. (PA ID 203234)
/s/Joshua M. Kershenbaum
Joshua M. Kershenbaum, Esq. (PA ID 203270)
FOUR TOWER BRIDGE
200 BARR HARBOR DRIVE, SUITE 400
WEST CONSHOHOCKEN, PA 19428
(610) 260-6054
(610) 646-0888 FAX
DAVE@DAVEFRANKEL.COM
JOSH@DAVEFRANKEL.COM
**Attorneys for Plaintiffs**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| BARBARA  and GEORGE PRICE, *on behalf of their daughter* O.P., *a minor, and individually on their own behalf*, | ) ) ) ) |
|  | ) CIVIL ACTION |
|  | ) NO. 3:11-cv-00095-JHS |
| *Plaintiffs*, | ) |
| v. | ) **FIRST AMENDED COMPLAINT** |
|  | ) |
| SCRANTON SCHOOL DISTRICT, *et al.*, | ) **(Jury Trial Demanded)** |
|  | ) |
|  | ) |
| *Defendants*. | ) |
|  | ) |
|  | ) |

## CERTIFICATE OF SERVICE

DAVE FRANKEL, ESQUIRE, hereby certifies that on the 21st day of

March, 2011, he caused to be served a true and correct copy of the foregoing

FIRST AMENDED COMPLAINT, by ECF to all counsel of record.

/S/ DAVE FRANKEL, ESQUIRE
DAVE FRANKEL, ESQUIRE